The next case this morning is 412-0311, U.S. Bank v. Horabik, et al. I'll show for the appellant Mr. Shanzel Haskins. Is that pronounced correctly, sir? And for the appellee, Mr. Thielen? Okay, Mr. Shanzel Haskins, you may be seated. May it please the court, counsel for the defense. Counsel. In construction of the owner's certificate for the Oakwood subdivision, both the trial court and the defendants failed to properly consider the language in paragraph 14 of the owner's certificate. Consideration of the language in paragraph 14 of that document and consideration of that in combination of paragraph 13 of the document leads to a different conclusion than that arrived at by the trial court. Either the plain language of the document or construction of the document dictate that the Oakwood Club Board has the ability to make assessments for maintenance of common areas of the subdivision prior to the sales of five lots in the subdivision. Looking at the specific language of the owner's certificate leads to that conclusion. Paragraph 13 provides that the owner of the unsold lot shall have no responsibility for maintenance other than that as an owner after five lots in the subdivision are sold. Paragraph 14 provides that the Oakwood Club Board can make reasonable assessments for maintenance and improvements. Neither of these provisions contains any language which says the assessments can only be made after five lots are sold. The language of the owner's certificate does not support the defendant's position. The specific provision at issue in paragraph 13 says after five lots have been sold, undersigned owners shall in no manner be responsible or liable for maintenance of the roads, planting strip, or the lake other than as an owner of any lot retained by them. That's the plain language of the document. The plaintiff's brief says that language should be construed to mean before five lots are sold, the owners of the unsold lots shall have all of the maintenance liability. Well, first, that is not what the document says. We cannot rewrite the document. I believe what they say there is opposite of the plain meaning of the document. Plus, it does not consider the provisions of paragraph 14 of the agreement. The agreement would have to be rewritten to have it comport with the position taken by the defendants. In addition to the lack of any time restrictions being placed in the agreement regarding the assessment for maintenance, inclusion of the word maintenance in both paragraphs 13 and 14 of the agreement evidences the intent of the document that the Oakwood Club Board should be able to make assessments for maintenance prior to the sale of five lots in the subdivision. If maintenance had been left out of paragraph 14, we would have a different case, but it's included. It's included in both paragraphs. And the inclusion of maintenance in both paragraphs 13 and 14 and the absence of any time restrictions on when assessments can be made for maintenance show the intent of the document that the assessments could be made at any time and are not limited by the sale of five lots. If we agree with your argument, aren't we reading out the requirement of the, quote, when five lots are sold, unquote, language? I don't believe so, Your Honor. Well, then no lots could be, or one lot could be sold, and the board can just go ahead and assess whatever. The board could go ahead, and I think that that was the design of the document. So then what does the phrase, when five lots are sold, mean? What does that limitation appear there, and what effect are we giving to it, given your interpretation? Well, I believe under the language of the document, what that does is automatically divest the owners of the unsold lots of any maintenance responsibility, whether or not the Oakwood Club Board is appointed. For instance, had in the first six months the lots were for sale in the subdivision, had six lots been sold, it might not have been necessary to appoint the Oakwood Club Board because the maintenance responsibilities would already be taken care of. That is a default provision, which would eliminate the maintenance responsibilities on the sale of the lot, on the sale of the lots. It does not modify the provision to make assessments in paragraph 14. I believe that's the correct instruction or construction of the document. Had maintenance been left out of paragraph 14, that might be the case. It would have only applied to improvements. But this gives a vehicle, in case the lots aren't sold, to transfer the maintenance obligations and not have them remain there in perpetuity down through generations, which might inherit the property. As I said, I believe it's possible to reach that conclusion from simply the language of the document. The rules of construction, if those are applied, if the court believes there is an ambiguity, also lead to the same conclusion. The rule of construction giving preference to a clause in a document which requires something to be done to affect the purpose of the document is applicable in this case. Because in order to assess the cost of maintenance among the owners of the lots, it's necessary for the owner of the unsold lots to make an appointment to the board, appoint the board of the Oakwood Club Subdivision Board, and enable them to make assessments. Under paragraph 13, which we were discussing, no action is required to continue the maintenance obligation prior to the sale of five lots. So an affirmative act is required to change that. The only way to change that obligation was to take action to appoint the Oakwood Club Board and give them that opportunity. And I think that follows the Harris Trust v. Hirsch case, which is cited in our brief. In construction of the documents, the defendants suggest the application of a rule of construction that an ambiguity in the document must be construed against the drafter. I don't believe that that rule is applicable in this case. As again in the cases cited in our brief, they indicate that that rule is a secondary rule of construction to be used as a rule of last resort and that generalizations regarding construction of a document can't be used to ignore the specific language of the document. I believe the language of the document here is very specific. The board can assess maintenance costs prior to the sale of five lots because there is no prohibition on that under the document. There are several matters which were not discussed by the trial court in its order, which have been raised by the defendant both in their summary judgment motion and in a brief filed in this court. They suggest first that the doctrine of res judicata bars this action. As we know from reading the record, there was in 2007 a small claims case filed in Morgan County with the same parties under which the defendants in this case were the plaintiffs and sought an order ordering the trust to reimburse them $7,300 for repairs made to the dam. The court entered an order in that case and the trust paid the $7,300. The defendant in this case filed a motion to dismiss based upon the res judicata argument and that motion was denied by the trial court. The res judicata then was asserted as an affirmative defense. The same basis for denying the motion to dismiss is the basis for discounting the res judicata argument in this case. The Goldstein case cited by the defendants as their only authority for the res judicata argument sets forth the elements of res judicata and one of those is an identity of the causes of action. That's what the trial court found was missing here and that is still what is missing here. This case deals specifically with the power of the Oakwood Club Board to assess maintenance costs under paragraph 14 of the owner's certificate. The Oakwood Club Board did not exist in 2007. It was appointed in 2009. So the issue which is present in this case was not present in the small claims matter involving the same parties. The identity of the causes of action is missing here and the res judicata doctrine is not applicable to this case. The defendants also assert that the language in paragraph 13 is a condition preceding to the exercise of the powers of the Oakwood Club Board under paragraph 14 in making assessments. It is not a condition preceding. There is no condition preceding language in the document. Again, the specific language of 13 says after five lots have been sold, the owner shall have in no manner be responsible or liable for maintenance. The defendants argue that the word after is a condition preceding language. However, the use of the word after in this refers to the maintenance being automatically eliminated. It divests the owners of maintenance responsibility. After five lots are sold, it does not prohibit assessment of the maintenance fees under paragraph 14 of the agreement. There is no specific condition preceding language in the document. Paragraph 13 should not be construed as an implied condition preceding. Again, the authority cited in our brief indicates that condition precedings are not favorable and they should not be implied when the implied condition preceding would result in a forfeiture. How about when they're stated? When they're stated, they apply. I don't need to infer any implication here. I don't think the language here is sufficient to create a condition preceding. So if they add when five lots are sold, comma, and we mean it, would that have sufficed? I think it would have had to have been in the provision in paragraph 14, which applies to the lots. Or there would have to have been language specifically in paragraph 13 to have said that it applied to the assessment in paragraph 14. I think with the language, that is... How about if they were the same paragraph together? Would that have helped? I don't think I could say if it would or wouldn't. It would depend on what the rest of the paragraph said, Your Honor. It would depend on what the language was. But I think if the language doesn't exist here, the condition preceding would have to be inferred. And the inferring of a condition preceding created by paragraph 13 would result in a forfeiture of the right of the Oakwood Club Board to make assessments as provided in the agreement. So I believe there is no specific condition preceding paragraph 13 or 14, and paragraph 13 should not be construed as an implied condition preceding. The other argument raised, which is not addressed by the trial court, dealt with the defendant's argument that a statement made by a trust officer in 2004 is somehow determinative of the construction of the agreement. I believe that the statement made by the trust officer in an email in 2004 does not determine the construction of the owner's certificate. The defendant refers to the statement made in an email in which the trust officer, who was not an attorney, gave her opinion that under the owner's certificates, the residents of the subdivision did not have maintenance responsibility until five lots were sold. The opinion of a layperson on the interpretation of a legal document does not determine the effect of the document. The construction is a pure question of law to be made from the language of the document by the court. The argument made also suffers the same infirmity as the race judicata argument does. That is, at the time the statement was made in 2004, no Oakwood Club Board existed. Unless the court has any questions, that concludes my argument. We would ask that the decision of the trial court be reversed, the decision denied summary judgment to the plaintiff in the matter of remanded instructions to end the summary judgment for the plaintiff and deny the summary judgment of the defendant. Thank you, counsel. Mr. Taylor? Good morning, your honors. May it please the court? Counsel? Counsel. My name is Mark Phelan. I'm here on behalf of the three couples that own the three lots and only three lots that have been purchased in the Oakwood subdivision. I think it's absolutely clear that the owner of the other seven is the bankless trustee. There's absolutely no dispute about that. I'm asking and have asked the trial court twice now, and the trial court has agreed with me twice, that paragraphs 13 and 14 can be harmoniously read together. The significant language in 13 is the last sentence. After five lots have been sold, the undersigned owner shall have no maintenance obligation other than as to any lots retained by them. I think that there is, in that sentence, when I read it, and I think when anybody would read it, there is certainly an implication of maintenance on the undersigned owners before five lots are sold. And I have given an analysis in my brief as to how I come to the conclusion that all of the maintenance obligation before five lots are sold rests upon the undersigned owners or their successors. After five lots are sold, the undersigned owners have a proportionate obligation as to any lots retained by them. Before five lots are sold, we must have something different. Otherwise, it would have said from the moment the subdivision is created, the owners or whoever is going to have a proportionate obligation to pay. It must be something different. Something different would be disproportionate. Now I have gone through in my brief and said there is zero maintenance obligation, there is some maintenance obligation, or there is all maintenance obligation. And I believe the clear implication when you read that sentence is that the owners would have all of the maintenance obligations prior to five lots being sold. I give those readings of continuity, marketability, investment versus non-investment. And for all I know, the Rose might have just been that benevolent to say we will take care of this until five lots are sold. Now paragraph 14, I don't believe 13 and 14 are ambiguous. I believe they can be read harmoniously. 14 creates the Oakwood Club Board. In its initial membership, the Rose had, didn't do it, but had the ability to theoretically stack the court if they wanted to. It was their choices. The ability of the owners who bought from them to vote would have only occurred after residencies were occupied on 50% of the lots. And I think it's no coincidence that we are talking about 50% in paragraph 13 and 50% in paragraph 14. If the board was created initially, and it's now created, you can certainly convene meetings. You can certainly have the owners of the lots in Oakwood subdivision come, listen to the agenda, discuss whatever needs to be discussed, have their input heard. But before five lots were occupied, it would have been the board appointed by the Rose making the decisions. Only after five lots are sold, I'm sorry, after residence on five lots, is the representation present. And with that representation comes the ability to be assessed. Now, we have other documents in this case. We have the trust agreement arising ten or so years later. The subdivision was platted and recorded, I believe, in 1972, and we have the trust agreement arising ten years later. The trust in Article 7 explicitly says, and Article 7 dealt with trust powers, Article 7 specifically said that trust can repair, manage, upkeep, the trust assets, the trust fund. So I think that is certainly an explicit acknowledgement that the trust has the ability to do the maintenance. Sounds kind of like boilerplate to me. It does. It does. But there's also paragraph 20, and it says that the bank, as trustee, can do anything any individual would do. Now, we have to get from the Rose being obligated to maintain all of the subdivision until five lots are sold, and we have to get that to the bank because the Rose no longer are with us. And we get that to the bank by the trust agreement, the trust powers under Article 7, and specifically paragraph 20 of Article 7 gave the bank the ability to act as any individual would. And that's create the initial board, and I think they'd also step into their shoes as to the maintenance obligation. And I think what cements that is when the deeds were done, I think they were done four months later in March of 83, the deeds obviously have the granting clause, the legal description of what's, I think they gave a large section and then accepted somehow, accepted six, the three lots that had already been sold. The last paragraph said, owner's obligations, rights, privileges, and duties under the owner's certificate shall remain personal so long as either one of them owns any adjacent property that was otherwise described in the deed. To me, that certainly shows that their obligations, and I say their, the Rose obligations under the owner's certificate were transferred by the deed and the trust agreement to the bank as trustee. With the reservation to them of those rights, privileges, obligations, and duties until they no longer own some adjoining property. If that reservation wasn't in there, then it would be somewhat of a different story. But it's in there. So that's the Rose acknowledging, yes, we have personal rights, privileges, obligations, and duties under the owner's certificate. One of those would be, in a harmonious reading of 13 and 14, their obligation to maintain until five lots are sold. Why do you think the provision in paragraph 13 is there about the five lots sold? Why do I think it's there? Why do they put it there? The biggest reason is, this is a subdivision, and home to families, kids ride bikes, run around, but in all actuality, this was, and is, still is, a business. They are selling lots to make money. The reason it is in there is, number one, I would think marketability. Justice Appleton, are you going to buy a lot there if you are told immediately as soon as you buy? If you're one of the first four, you get to buy it, and you don't have any maintenance obligations until five lots are sold. Or, is it going to be more attractive if I say to you, are you going to buy it? Oh, but here's a cost that you're going to have to incur besides principal, interest, real estate taxes, you also have to pay maintenance. Now, I don't know if you could buy it outright, Your Honor, but if you had to borrow, you would want to certainly account for that. So, I think number one is marketability. Number two would be control. I don't know how long the Rose had this property, but people have an affinity for their property. And, as part of that affinity, they may want to keep control until five lots are sold. Paragraph 13 allows, only allows, the other people buying from them to vote until occupancy on 50% of the lots. Prior to that, the Rose are the decision-makers. Or, the board, that they may or may not have staffed, is the decision-maker. Do you suppose the developers ever foresaw the situation where they didn't sell five lots and would be stuck with maintenance? Well, I will say this. That's entirely possible because they created the subdivision in 1972. And, I don't know how old they were, the Rose, I don't know how old they were. But, they created it in 1972. And, in ten years, only three lots have sold. So, now they think, continuity, how are we going to maintain this? We're not going to live forever. Are we going to, well, they go to Mr. Rammelkamp, what are we going to do here? Mr. Rammelkamp says, well, we can put the property in a trust, have a financial institution, which is not going to be a measured life of a human individual, but will be in existence as long as the doors are open, to be the trustee. So, of those, I think I listed those reasons, at least in my mind, most important, top to bottom. But, I think all of those are logical and valid reasons for what was done in paragraph 13 and paragraph 14. On the smaller issues, I didn't raise Grace Giudicata. It was raised by me in the trial court. It was not a basis of the trial court's decision. It was raised by Mr. Shannon Haskins in his appellate brief. I think it's a valid argument. There is a factual difference. The factual difference being, in the small claims case, when we had to repair the downpipe, there had been no board created at that time. But, I think the legal, the identity of cause of action, being the legal cause of action, has always been the same. And that is, who has the maintenance obligations when five lots have not been sold? Now, I don't know if the court has even authority or jurisdiction to review that. I did not file a cross appeal. I did not. You won at the trial level. Why would you be appealing? Exactly. The last small issue is the deposition of Mary Ferguson. And, I believe it to be relevant and admissible. She was, having taken her deposition, she wasn't a real educated woman. I think she went to one of the Ivy League schools. And I think had Latin or some other old language as her major. And, she penned the email that says, you know, the owners of the three lots don't have any obligation to tell if five are sold anyway. And I'm arguing under Illinois Rule of Evidence 701, that lay opinion would be admissible if it's based upon their perception, the rational perception of that person. If it is helpful for the court to understand her testimony or the determination of a fact. So, kind of like someone testifying that the car was speeding, or the person I saw was angry, she appeared angry, that's based on the same sort of perception? Except this happens to be a document. You know what, you're right. Maybe there's a difference here, counsel. There's an intellectual component to what she has done. Rather than witnessing the speed of the vehicle. So, I'm saying that yes, her testimony is relevant and admissible. Under the 701, the last is that it's not based upon any scientific, technical or other expertise. And it's not. She's just simply reading. Like you would read it, like I would read it. And that's the conclusion she came to. And for that reason, I thought that it would be admissible and relevant. And if your honors don't have any questions, I would simply ask for the courts to affirm the trial court. And thank you. Okay, thank you, counsel. Any rebuttal, sir? Yes, your honor. Okay. Briefly, Mr. Thielen speculated on the intent of the rows. The intent of the rows here, we have to determine, I believe, from what is in these documents, from the construction of the language of the documents. The 50% requirement that he discussed is not the same in both paragraph 13 and paragraph 14. The 50% requirement in paragraph 13 deals with five lots being sold. And as I said earlier, that would divest, five lots being sold, would divest the owners of any maintenance without the appointment or without any reference to the Oakwood Club Board. Paragraph 14, the 50% requirement in that is keyed to when 50% of the lots are approved with occupied residences. And the purpose of that requirement, I believe, as I indicated in my brief in paragraph 14, has to do with control of the board. The document was drafted so that it would not be possible to get control of the Oakwood Club Board by buying five lots and then getting control of the board in the power to make assessment unless those lots were approved with residences that were inhabited. So the maintenance of the owner's control of the board was protected in that and it was protected, I believe, from the face of the document to have a situation, to protect them in a situation like this. That is, where the lots didn't sell, to make sure that that maintenance responsibility did not rest in perpetuity with the owners of the unsold lots. Well, I mean, I understand you're the bank, not the subject, but the original owner. Yes. But you're selling a product. We're going to have a nice subdivision. There are only going to be ten lots. You're going to buy a lot here and we're going to have ten houses. We're not going to have empty lots. Why in the world should I pay, if I'm an owner of one lot or two lots, why is it that I'm paying for your inability to sell the other lots? That's in effect what I'm doing. Maybe that's the reason the lots have sold. I don't know why the lots have not sold. But I think that the answer to that is prior to purchasing the property, these covenants are recorded, they run with the land, they show up in the title commitment. You have the opportunity to read those and say, well, here it says that after five lots are sold, it also says here in the next paragraph that they can appoint a board and the board can assess these maintenance obligations. So you come in there knowing what you're getting. You're not buying a pig in the poke. That's the reason they're recorded. And I think, as Mr. Thielen said, the bank steps into the shoes of the rose and there's no, he concedes in his brief, there's no doubt that the bank had the authority to appoint the board. But they step into their shoes. Yes, they had the duty to maintain until five lots were sold, but they also had the right to appoint a board to make these maintenance assessments. The provision in paragraph 14, I said, was put in there to cover this situation, I believe from construing the documents, and that is further borne out, as I said earlier, by the inclusion of the term maintenance in paragraph 14. So it was contemplated that the board would have the ability to make pro rata assessments of maintenance without time limitation, and it covers the situation that we're in now, that for some reason those lots haven't sold, and the maintenance does not rest in perpetuity with the owners of the unsold lots. As to the argument made regarding the deposition testimony of Mary Ferguson, I think it is clear that that is a legal opinion of a lay person on a legal issue that was a construction of a document and is not admissible or should be considered in this case. I would ask the court, as I did at the conclusion of my opening argument, to reverse the judgment of the trial. Okay, thank you, counsel. The court will take this matter under advisement and be in recess for a few moments.